## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| KIMBERLY KOCH, | ) |
| | ) CIVIL COMPLAINT |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. |
| NORTHEAST RECOVERY | ) |
| SOLUTIONS, LLC and JAMIE L. | ) |
| GEMMATI, | ) |
| | ) **JURY DEMAND** |
| Defendants. | ) |
| | ) |

## COMPLAINT

Now comes Kimberly Koch ("Plaintiff"), complaining as to Northeast Recovery

Solutions, LLC ("NRS") and Jamie L. Gemmati (collectively, "Defendants"), as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action pursuant to the Racketeering Influenced

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; the Ohio Corrupt Practices

Act ("OCPA"), R.C. 2923.31 *et seq.*; the Ohio Consumer Sales Practices Act, R.C. 1345.02

*et seq.*; and Ohio common law for invasion of privacy.

### JURISDICTION AND VENUE

2.      Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §

1692, as well as 28 U.S.C. §§ 1331 and 1337, as the action arises under the laws of the

United States.  Supplemental jurisdiction exists for any state law claims pursuant to 28

U.S.C. § 1367.

[ 1 ]

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claims occurred within this District.

## PARTIES

4.      Plaintiff is a natural person residing in Akron, Ohio.

5.      Defendant NRS is a third-party debt collector located in Amherst, New York.  At certain times relevant to this action, NRS had its principal place of business at 25 N. Pointe Pkwy, Ste. 500, Amherst, NY 14228.  Currently, NRS's principal place of business is 37 Kirkwood Dr., West Seneca, NY 14224.

6.      Defendant Jamie L. Gemmati is the sole owner, CEO, and—on information and reference—the sole current employee of NRS.  She resides at 37 Kirkwood Dr., West Seneca, NY 14224.

7.      Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to the instant action.

## INTRODUCTION

8.      Defendants are involved in an ongoing scheme whereby they have conspired to use false representations and threats to coerce the payment of money from consumers across the country who allegedly have failed to repay payday loans.

9.      This conspiracy, like many similar schemes, is located in and around the Buffalo, New York area.

10.     Over the past two decades, Buffalo has become so well-known as the capital of such debt collection schemes that in February 2020, a movie about sketchy debt-collection was titled "Buffaloed."

11.     These schemes generally use a style of debt collection script that is known as "The Shakedown" or "The Shake."

12.     The principal characteristic of "The Shakedown" is its frequent, blatant, and illegal use of what are known in the debt collection industry as "legal talk-offs"—that is, misleading legal references and legal threats.

13.     For instance, a collector will pretend to be a local process server and will state to the consumer that "charges" have been filed against the consumer. The caller will represent that he is attempting to locate and serve the consumer with a summons and complaint that has been filed with a court. The caller suggests that the charges might not be pursued if the consumer calls a toll-free number in the next several hours and arranges to pay money (sometimes called "restitution") to the fake process server's "client" or to a supposed third-party "mediation" or "arbitration" company.

14.     Threatening messages are often purposefully left with the consumer's relatives, employer, or other third parties in order to increase the likelihood of a response.

15.     When the consumer responds to the call, the collector (often posing as an attorney or paralegal) accuses the consumer of misdeeds, makes false threats of pending litigation (and sometimes prosecution), and demands payment of the alleged debt.

[ 3 ]

16.     Of course, no lawsuit has been filed.  Often, the caller misrepresents and grossly overstates the amount owed.  Sometimes the debt is even time-barred.  Often, the consumer's personal, financial, and account information will have been stolen and will have been sold and resold to multiple parties, such that the caller no longer owns or otherwise has any right to collect the account.  Consumers are often bullied and intimidated into paying the alleged debt to multiple entities.

17.     When sued for violating the Fair Debt Collection Practices Act ("FDCPA") or other laws, most of the entities default, accumulate default judgments, and continue to operate under a progression of limited liability companies.

18.     Hilton Parker LLC is one of the few law firms willing to locate and sue these companies—a process which often involves obtaining a large default judgment and then spending months or years in post-judgment litigation to make the offenders pay.  The purpose of lawsuits like the present suit is to flip the tables, turning the former "debtor" into a judgment creditor with the power to—through entirely legal channels—do to the collector what that collector illegally threatened to do her.

### THE RICO ENTERPRISE

19.     For purposes of RICO, the "enterprise" in this action consists of Defendants Northeast Recovery Solutions, LLC ("NRS") and Jamie L. Gemmati, together with a group of approximately four other debt collectors who gathered at 25 N. Pointe Pkwy, Ste. 500, Amherst, NY 14228 to collect upon payday loan accounts.

20.     Ms. Gemmati registered NRS with the New York Secretary of State on December 15, 2014.

[ 4 ]

21.     Ms. Gemmati knew that her enterprise would engage in violations of the FDCPA, and would even engage in routinely extorting consumers for payments in violation of criminal laws.

22.     She therefore underfunded NRS and kept its account balances artificially low so as to keep the business "judgment proof."

23.     For instance, when NRS was sued in *Hofer v. Northeast Recovery Solutions, LLC*, Case No. 4:16-cv-01793 (E.D. Mo. Nov. 18, 2016), Ms. Gemmati attempted to evade payment on an FDCPA claim by stating that "I am an LLC and do not have anything to offer."  She also stressed to the attorneys bringing the suit that "[Y]ou can't collect on something I do not have."

24.     Meanwhile, Ms. Gemmati and the collectors falsely represented to hundreds (or even thousands) of consumers that NRS was a "Mediation Group" ready to take them to court over their old payday loans.

25.     The enterprise pretended to be a law firm; threatened consumers with fake lawsuits or stated that lawsuits against them had already been filed; and contacted debtors' friends, family, coworkers, and bosses and revealed embarrassing (and often false) information about debtors.

26.     A sampling of consumer complaints about NRS is instructive.  One website that lists consumer complaints about a telephone number that NRS uses contains testimonials from consumers such as:

    a.  8/21/2017:  "Rude woman asked to leave a message for my husband to call her back about a 'secret' case against my mother-in-law. I told them to

[ 5 ]

stop calling and they found my husband's work number and started harassing him there. Ridiculous."

b.  10/20/2017:  "They keep calling from different numbers looking for my son. They tell you you are a contact. They won't quit calling even though I was told they would take me off the list."

c.  11/2/2017:  "Lady called and left a message about myself having a suit against someone. This is not true and the other person has died. Thee lady did not leave a business name."

d.  11/9/2017:  "BS number contacted 4 different people in my family saying I had a complaint against me. Had a friend who is an attorney call them & it was a debt collector from a credit card I co-signed on over 10 years ago."

e.  12/27/2017:  "A person Tasha Andrews called me, my brother and mother all stating I had a pending case against me. Called back and asked to have an email sent regarding who she was and that her company had permission to collect any debt. She got very aggressive and when I pushed to just have an email with an account # etc, she yelled at me and hung up. Spoke to an attorney friend of mine, doesn't seem legit as I was asking for normal items before you'd want to give any money to some company over the phone."

f.  12/28/2017:  "Yep Tasha Andrews, rude lady about a complaint against a family member. Try to scare you and want money for something. I hung up and blocked her [***]."

g.  1/10/2018:  "Got a voicemail from a woman stating a relation of mine 'has a complaint against them' and advised me to have them contact her at this number."

h.  1/24/2018:  "I got the exact same call today(1/24/18), told me her name was Tasha Andrew and she was calling with regards to a complaint against me in the county that I live.  Called twice today and have been calling at least 3-4 times daily from different numbers. Will call from a local area code, then leave a message with the 877-890-1760.  I have not and will not return her call, I just hope they don't show up at my home or place of work.  Thank you!"

i.  2/2/2018:  "Tasha Andrews is a busy woman! Called with the same message about a complaint pending against me. Called a family member in another state to try to get in touch with me. Legal matters are not handled with a phone call. Blocking the number."

j.  3/20/2018:  "Tasha Andrews called and left a message regarding a "pending case" filed in my county.  Called several family members and was very rude, aggressive and disrespectful to my elderly parents.  Calls my work number 3-4 times a day, my cell number more.  I have returned the call 3 times so far, will NOT give me any information unless I give them my social security number, dob and maiden name.  I DONT think so."

k.  11/13/2018:  "Tashi Andrews called and left a message for one of my in-laws that I don't speak to that theres a complaint against me and to call her right away. It's a total scam."

l.  2/6/2019:  "Tasha Andrews called my son this afternoon in regards to me.  She said I had a "complaint" filed against me in Pensacola.  I've never stepped foot in Pensacola.  She had my poor son worried that I would be in legal trouble.  I don't have any suits pending against me nor do I have any debt except my car payment which is paid on time every month.  If she's calling regarding a debt, then it must be YEARS old!"

m.  5/13/2019:  "This number has called me in the past about a complaint and also family in another state. There is no such complaint. The last call was I had to go to the Courthouse asap. This number will scare you into thinking there is a complaint but there is not. Review your credit report for any possible identity theft. Scary."

n.  9/24/2019:  "Tasha Andrews left a voicemail on my number, called me by my previous married name that I haven't used in over a decade, and told me "Johnny Johnson" has a complaint against them and I'm a contact. I called back, told her I do not know who that is and to not contact me again. She yelled, cussed, and hung up when I insisted I do not know this person. The number she called from has been blocked."

27.    Scores of other similar consumer complaints can be found on the Internet with respect to the enterprise.

28.    In sum, the enterprise carried out a years-long campaign designed to embarrass, intimidate, and humiliate consumers into paying on payday loan accounts.

## BACKGROUND ON PLAINTIFF'S ACCOUNT

29.     On June 27, 2018, Plaintiff obtained a loan from the tribal payday lender Plain Green, LLC, in the amount of $1,000, having an account number ending in 4355 (the "account").

30.     The account had a purported annual interest rate of 368.25%.

31.     Plaintiff used the account to pay for everyday living expenses, such as, on information and belief, groceries and household items for personal use and consumption.

32.     Plaintiff was unable to continue to make payments on the account, and Plain Green, LLC charged it off on October 14, 2018.

33.     During the 110-day period that interest accrued on the account, at a rate of 368.25%, a total of $1,109.79 in interest accrued, making the total amount due $2,109.79.

34.     No further interest accrued on the account.  On October 14, 2018, Plain Green, LLC wrote the account off as bad debt.

35.     On that date, Plain Green, LLC stopped sending periodic account statements to Plaintiff and waived the ability to charge further interest.

36.     After the account was in default, NRS purchased it (renaming it File No. 1201552) and began to collect upon it.

## THE ENTERPRISE'S COLLECTION EFFORTS AND EXTORTION OF PLAINTIFF

37.     During 2019, the enterprise began a calling campaign to harass Plaintiff into paying on the account.

38.     The enterprise called Plaintiff as many as eleven times per day, and it called multiple days in a row during an approximately eight-month period.

39.     Collectors from the enterprise, when speaking with Plaintiff, would pretend to be from an office of lawyers; would reference a case number that they purportedly had from the "docket" of a fake lawsuit "filed" against Plaintiff; and falsely threatened to garnish Plaintiff's wages.

40.     The collectors also falsely informed Plaintiff that "local law enforcement" was aware of the "case" against her, and that she was required to "confirm" her address for further legal action.

41.     The collectors of the enterprise even went so far as to threaten Plaintiff with arrest if she did not pay on the account.

42.     At the same time the collectors also began a campaign to call Plaintiff's father.

43.     In October 2019, the collectors—in order to expose Plaintiff to ridicule and damage her personal and business reputation—told Plaintiff's father that she was in trouble with the law.

44.     Plaintiff's father did, indeed, then believe that Plaintiff was in serious legal trouble.

45.     Plaintiff suffered serious embarrassment, shame, and outrage from Defendants' above-mentioned conduct.

**PLAINTIFF'S DAMAGES TO BUSINESS OR PROPERTY**

46.     Plaintiff, fearful that the enterprise would further damage her reputation or even send her to jail, made periodic payments of $107.94 to NRS.

47.     At least two such payments were debited from Plaintiff's account.

48.     On or about October 11, 2019, Plaintiff also retained the services of a bankruptcy attorney to protect her from further legal threats, paying a $200 deposit (of which only $100 was eventually refunded).

**COUNT I — THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

49.     Plaintiff realleges the paragraphs above as though fully set forth herein.

50.     The Racketeer Influenced and Corrupt Organizations Act ("RICO"), pursuant to 18 U.S.C. §§ 1962(b), prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

51.     RICO, pursuant to 18 U.S.C. 1691(3), defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."

52.     The Defendants are "person[s]" within the meaning of § 1691(3).

53.     RICO, pursuant to 18 U.S.C. § 1691(4), defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group if individuals associated in fact although not a legal entity.

54.     The Defendants form one single enterprise because they, along with the other debt collectors who gathered at Northpointe Parkway, are associated in fact.  In particular, Ms. Gemmati is the owner of NRS and manages all of its day-to-day operations, closely overseeing the handful of other collectors.

55.     RICO, pursuant to 18 U.S.C. § 1691(1), defines "racketeering activity" to include "any act or threat involving . . . extortion . . . which is chargeable under State law," and "any act which is indictable under . . . section 1343 (relating to wire fraud)."

56.     RICO, pursuant to 18 U.S.C. § 1691(5), defines a "pattern of racketeering activity" to require "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

57.     18 U.S.C. § 1343 states that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of fraudulent premises . . . transmits or causes to be transmitted by wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

58.     The Collector Defendants participated in a "pattern of racketeering activity" when they, two or more times, transmitted or caused to be transmitted to Plaintiff, by email and telephone, writings and sounds intended to defraud Plaintiff into making payments on a consumer debt that was artificially inflated above its correct balance.

[ 11 ]

59.     The fraud here includes calls placed in October 2019 falsely informing Plaintiff that she would be arrested if she did not pay, and stating that local law enforcement was aware of a case against her.

60.     Further, Ohio law, pursuant to R.C. 2905.11, defines "extortion" by stating:  "No person, with purpose to obtain any valuable thing . . . shall do any of the following: . . . (4) Utter or threaten any calumny against any person; (5) Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute, or to impair any person's credit."

61.     "A calumny is a false statement made to injure one's reputation or character and need not be directed against the victim of the extortion."  *State v. Stone*, 1992 Ohio App.LEXIS 1306, at *20 n.6 (Ohio Ct. App. 4th Dist. Mar. 26, 1992).

62.     The Defendants also participated in a "pattern of racketeering activity" when they, two or more times, threatened Plaintiff with arrest and imprisonment and the naturally attendant reputational harm, and threatened to continue informing Plaintiff's father of the supposed legal troubles of Plaintiff if she did not pay.

63.     The Defendants each individually and together participated in the conduct of the affairs of the enterprise through the above-described patterns of racketeering activity.

64.     The Defendants therefore violated 18 U.S.C. § 1692, and Plaintiff suffered monetary damages thereby when she was unlawfully deprived of several hundred dollars, including both her payments to the enterprise and to a bankruptcy attorney.

65.     RICO, pursuant to § 1694(c), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

66.     Plaintiff is thus entitled to treble damages and attorney fees for this Count.

### COUNT II — VIOLATIONS OF THE OHIO CORRUPT PRACTICES ACT

67.     Plaintiff realleges the paragraphs above as though fully set forth herein.

68.     The Ohio Corrupt Practices Act ("OCPA"), pursuant to R.C. 2923.32(A)(1), provides that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

69.     The OCPA, pursuant to R.C. 2923.31(G) and R.C. 1.59, defines the term "person" to include an individual, corporation, business trust, estate, trust, partnership, and association.

70.     The Defendants are "person[s]" within the meanings of R.C. 2923.31(G) and R.C. 1.59.

71.     The OCPA, pursuant to R.C. 2923.31(C), defines an "enterprise" to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity."

72.     The Defendants constitute an "enterprise[s]" within the definition of R.C. 2923.31(C).

[ 13 ]

73.  The OCPA, pursuant to R.C. 2923.31(I)(1), defines "corrupt activity" to include all conduct defined as "racketeering activity" under RICO.

74.  The OCPA, pursuant to R.C. 2923.31(E), defines a "pattern of corrupt activity" to mean "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

75.  The Defendants violated R.C. 2923.32(A)(1) by participating in the affairs of an enterprise or enterprises through multiple incidents of corrupt activity.

76.  For instance, the Collector Defendants violated Ohio extortion law, pursuant to R.C. 2905.11, and committed wire fraud as set out in the previous section.

77.  Further, Defendants violated R.C. 2923.32(A)(1) by participating in the collection of an unlawful debt.

78.  The OCPA, pursuant to 2923.34(E) provides that "[i]n a civil proceeding under division (A) of this section, any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code . . . shall have a cause of action for triple the actual damages the person sustained."

79.  There is no requirement under the OCPA that the damages be related to injury to business or property.  *Consolo v. United Mediation Grp., LLC*, No. 17-cv-681, 2018 U.S. Dist. LEXIS 65341, at *9 (N.D. Ohio Apr. 18, 2018).  Plaintiff is therefore entitled to triple his noneconomic damages.

## COUNT III – VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT

80.     Plaintiff realleges the above paragraphs as though fully set forth herein.

81.     The CSPA, pursuant to R.C. 1345.02(A), states that "[n]o supplier shall commit an unfair or deceptive practice in connection with a consumer transaction."

82.     Plaintiff is a "person" as defined by R.C. 1345.01(B).

83.     Defendants are "supplier[s]" as defined by R.C. 1345.01(C).

84.     Debt collection is part of a "consumer transaction" as defined by R.C. 1345.01(A).

85.     R.C. 1345.09(B) thus grants Plaintiff a private right of action against Defendant for $200 per violation of the CSPA, plus noneconomic damages of up to $5,000 per violation in an amount to be determined at trial, plus attorney fees, enhanced attorney fees, punitive damages, treble damages, and further relief.

86.     Defendants committed unfair or deceptive acts or practices in violation of the CSPA, R.C. 1345.02(A), when Defendant engaged in the specific acts and practices in violation of the FDCPA, 15 U.S.C. 1692, as set forth above, including:

    a.    Communicating about the debt with third parties in violation of § 1692c(b);

    b.    Repeatedly calling Plaintiff in violation of § 1692d(5);

    c.    Pretending to be a law firm in violation of § 1692e(3);

    d.    Falsely threatening Plaintiff with arrest and lawsuits in violation of § 1692e(5);

    e.    Using false names with the word "Mediation" in the title, in violation of § 1692e(14); and

f.    Collecting a debt the amount of which was falsely inflated, in violation of § 1692f(1).

87.    Defendant's actions therefore violated the CSPA, and Plaintiff is entitled to damages.

### COUNT IV — INVASION OF PRIVACY

88.    Plaintiff realleges the paragraphs above as though fully set forth herein.

89.    Ohio recognizes a cause of action for invasion of privacy based on "wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Sustin v. Fee*, 69 Ohio St.2d 143, 145, 431 N.E.2d 992, 993 (Ohio 1982) (quoting *Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (Ohio 1956)).

90.    The Collector Defendants invaded Plaintiff's privacy by threatening Plaintiff and repeatedly calling him about a debt he did not owe.

91.    The Collector Defendants' actions were so outrageous that they would cause shame or humiliation to a person of ordinary sensibilities, and Plaintiff was injured by this conduct.

92.    Plaintiff is entitled to actual and punitive damages for this conduct.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff treble RICO damages and attorney fees;

b.    Awarding Plaintiff treble damages, including triple noneconomic damages, under R.C. 2923.34(E);

**c.**      Awarding Plaintiff punitive, statutory, treble, and economic damages

under the CSPA, together with attorney fees;

**d.**      Awarding Plaintiff actual and punitive damages for invasion of privacy;

**e.**      Awarding Plaintiff the costs of this action; and

**f.**      Awarding any other relief as this Honorable Court deems just and

appropriate.

**A TRIAL BY JURY IS DEMANDED.**


By:  s/ Jonathan Hilton

Jonathan Hilton (0095742)
HILTON PARKER LLC
7544 Slate Ridge Blvd.
Reynoldsburg, OH 43068
Tel: (614) 992-2277
Fax: (614) 927-5980
jhilton@hiltonparker.com
*Attorney for Plaintiff*